IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 7, 2009 Session

# CORPORACION EUANITOS, S.A., ET AL. V. MONTLAKE PROPERTIES, INC. ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 08-0129    W. Frank Brown, III, Chancellor**

_____

**No. E2008-01548-COA-R3-CV - FILED JANUARY 28, 2010**

_____

Corporacion Euanitos, S.A. ("Plaintiff")[1] sued Montlake Properties, Inc.; Montlake Property Owners Association, Inc.; and Luken Properties, LLC seeking, in part, a restraining order and a permanent injunction prohibiting the defendants from pumping water from a lake, Montlake, located in Hamilton County. After a trial, the Trial Court entered its order finding and holding, *inter alia*, "[t]hat Luken Properties, LLC, has an easement right to withdraw water from Montlake." Plaintiff appeals to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J. joined.

John C. Cavett, Jr., Chattanooga, Tennessee, for the appellant, Corporacion Euanitos, S.A.

Carol M. Ballard and William H. Horton, Chattanooga, Tennessee, for the appellees, Montlake Properties, Inc.; Montlake Property Owners Association, Inc.; and Luken Properties, LLC.

---

[1]While Betty Henn and Jo-Net Corporation were named plaintiffs in this suit, neither Betty Henn nor Jo-Net Corporation are involved in the appeal now before us. For ease of reading only, we refer in this Opinion to Corporacion Euanitos as the plaintiff in the singular.

# OPINION

## Background


In July of 1970, Montlake, Inc. conveyed to Mowbray Mountain Utility District ("Utility District") a parcel of real property and:

> a permanent easement and right of way for water line fifteen (15) feet wide including sufficient working room to install, repair and maintain the same, including the perpetual right to enter upon the real estate hereinafter described at anytime that it may seem fit and construct, maintain and repair underground water lines or mains for the purpose of conveying water over, across, through and under the lands hereinafter described together with the right to excavate and refill ditches and/or trenches for the location of said water lines and/or mains and the further right to remove trees, bushes, underground and other obstructions interferring [sic] with the location of said water lines and/or mains.
>
> Further Montlake, Inc. hereby grants, bargains, sells and conveys unto Mowbray Mountain Utility District of Hamilton County, Tennessee, a permanent easement or right to draw water from "MONTLAKE" owned by the grantor for so long as water shall be present in said lake.


The easement conveyed to the Utility District by Montlake, Inc. ("the Easement") is shown on a plat recorded in February of 1985 in Plat Book 40, page 7. The Utility District conveyed the Easement to Luken Properties, LLC ("Luken Properties") in February of 2007.

Plaintiff acquired several parcels of land at Montlake during the 1990s and thereafter. Of those parcels, two are relevant to the issues involved in this case, Lots 61 and 65. The deeds to Plaintiff for Lots 61 and 65 show that the parcels were acquired subject to the Easement as noted on the plat recorded in Plat Book 40, page 7.

In February of 2008, Plaintiff sued Montlake Properties, Inc.; Montlake Property Owners Association, Inc. ("Property Owners Association"); and Luken Properties seeking, in part, a restraining order and a permanent injunction prohibiting the defendants from exercising the Easement to extract water from Montlake. Plaintiff raised, among other things, claims that the Easement had been abandoned, that equipment abandoned by the Utility District created an attractive nuisance, and that extracting water from Montlake was

causing erosion and pollution. The case was tried in May of 2008.

Herschel Pollard testified that he is the founder, president, and sole owner of Plaintiff. Mr. Pollard resides primarily in Florida. Mr. Pollard testified that his lots "go out to a point in the lake, to the, you might say, the southeast of the lake." Mr. Pollard testified that there are six lots that encompass the property around Montlake and that those six lots are owned by him, Jo-Net, and Betty Henn. He stated that there are no other owners of any lots that abut Montlake. Mr. Pollard personally purchased the first of his lots in approximately 1988. Mr. Pollard testified that he rents one of his houses at Montlake on an annual basis and leases the other periodically.

Plaintiff, the corporation, did not purchase land at Montlake until 1998. Plaintiff owns Lot 65 and at the time it purchased this lot, the golf course had been built, the pumping station existed, the platform existed, the dams were being built, and the stream ran through the golf course. Lot 65 has no house on it, and Mr. Pollard testified that he intended to preserve lot 65 and never build a house on it.

Lot 65 is adjacent to a lot containing what Mr. Pollard characterized as "[a]n abandoned pumping shed" owned by the Utility District. Mr. Pollard was shown the pumping shed on one occasion by Utility District employees, and he described it as a tin building that contained concrete tanks. Mr. Pollard further testified that there also is a steel platform that hangs out over the lake with pipes running down from the platform into the lake where the pipes connect to large suction pumps. Mr. Pollard testified that the pumping station has not been used since Plaintiff purchased its first lot. He further stated that the old suction pumps have since been removed and new pipes were installed in the lake. Mr. Pollard first noticed the new pipes around Christmas of 2007.

Mr. Pollard estimated that the platform that hangs out over the lake is approximately 65 feet above the surface of the lake. When asked about his concerns with regard to the platform, Mr. Pollard testified:

> Well, prior to this addition of the new equipment, I was concerned about it as an attractive nuisance. In my opinion, it was an attractive nuisance. There were trespassers going on it on a constant basis, daily basis, who came on the property and came down the steps to the platform. Some of them merely came to view the lake; some came to fish; some came to do some target practice with their high-powered rifles. Some people - - some of the younger men came to prove their manhood and leap from the platform into the water, and this happened on quite a constant basis. And there were other problems as well.

Mr. Pollard posted no trespassing signs, but the signs were torn down.

Mr. Pollard testified that people swim and fish in Montlake and stated: "Of course, I've prohibited [my children from swimming] strictly because of the extreme hazard that Montlake Golf Course created there with their electrical installation." Mr. Pollard was told that two 210-volt pumps were installed about 25 feet in the lake and that these pumps are intended to pump 100 gallons per minute each out of the lake and transport it to the pumping station. A document titled "Owners Guide To Installation And Operation Of … Submersible Pumps" was introduced at trial. This owner's guide contains the following language: "WARNING: The pump is intended for use in a well. Motor frame must be connected to power supply ground or fatal electrical shock may result. Do not use this pump in swimming pools." Mr. Pollard stated: "they are numerous, and I do mean numerous incidents of electrical shock, drowning in that area." Mr. Pollard further stated:

> I've been aware of the danger of submerged electrical pumps for many years. And anybody who reads the newspapers is aware of that. I'm a boater, and I know the very grave danger of electrical shock, grounding, with regard to underground electrical appliance connections with boats. And I know the same danger exists in open ponds when you drop submerged pumps into ponds. It only takes about eight millivolts to stop the heart. And there are many, many instances of electrical-shock drowning in this area from that very cause.

However, Mr. Pollard admitted when questioned further that he stopped swimming in the lake and stopped allowing his children to do so before finding out about the pumps. He admitted that he stopped his and his children's swimming in the lake due to chemical pollution.

When asked about his concerns regarding pumping water from Montlake, Mr. Pollard stated:

> Well, I had multiple concerns. During the twenty-odd years that I had owned property up there, I had seen a progressive decline of the quality of the lake in terms of its flora and fauna, and also, in my opinion, of its geological stability. But it seemed to me that, obviously - - here again, this is my opinion - - that the lake was becoming progressively polluted, and I was afraid that if water were taken out of the lake and taken back up to the golf course and if it came back down the same path, down the creek and back to the lake, over and over in the cycle, that the lake would eventually become a chemical soup.

-4-

A photograph was introduced at trial that Mr. Pollard:

> took from my terrace in the summer of 2004 when there was a rain, and we got a pretty good downpour there for a few minutes, and it shows that the waterfall is flowing freely and it's carrying a large amount of silt into the lake from the golf course and it's turning the lake brown.

When asked what he had observed with regard to the natural rise and fall of Montlake, Mr. Pollard stated:

> During the dry season, the water level drops dramatically. This was even before the entire flow of water was stopped, coming down. It's a natural rise and fall of the lake level. It's been going on for many years I'm sure. When it's down like that, the water is chirted. There's a lot of algae in the water. Then later when we get some rain fall, it rises somewhat.

> The fish population seems to get a bit lazy during the dry season. You don't see them a lot; they go down to the bottom of the lake, I suspect. Then later, when there's more water, they tend to be more up on the surface. That was back when we had fish; we don't have fish anymore.… Interestingly, if you look back in the old photographs, you'll see that down in the lake, it was a Garden of Eden down there, with all sorts of trees. And when I purchased the property, there was a lot of wildlife. We had deer and raccoons and foxes that would come down to the water and drink. There was no difficulty going down there and catch fish. I would catch at least several bass every evening.

> And in the recent years, I would say over the last decade, every single one of the trees down there, even the one[s] that were, oh, 50 years old or more, have died and have rotted away. There are no more wild azaleas down there. There is no more laurel down there. I haven't seen a wild animal down there in years. And, as I said, we don't even have fish for a fry or crawfish anymore, at least not that I've been able to.

Mr. Pollard, through his attorney, wrote a letter to the Utility District in 2004 asking it to abandon the pumping station. The Utility District did not respond to this request.

Henry G. Spratt, a professor of microbiology at the University of Tennessee, Chattanooga testified as an expert witness for Plaintiff. Dr. Spratt described what he did in connection with his analysis for this case as:

a study that follows along with a series of other studies I've done in some local ponds and local waterways, streams and wetlands. We're looking at the presence or absence or [sic] a group of bacteria that are capable of breaking down aromatic chemical structures that are common to herbicides and other types of pesticides.

Dr. Spratt described Montlake stating:

Montlake is an interesting structure, in that it's one of the few, if not the only, natural lakes in this area of Tennessee. It's located up on the Cumberland Plateau. It represents an area where the sandstone cap has collapsed down into lower levels of mountain structure, and it makes virtually an almost perfect circle structure of about two acres in size. And then it's relatively deep. From what I hear, hundreds of feet deep. And it's been there for a number of years. That's what my geology forensic told me.

Dr. Spratt looked at contour maps of the area and determined that "there's a main drainage channel that runs from up higher on the plateau and drains directly into Montlake. And there are no streams that lead out of Montlake." The drainage channel that drains into Montlake comes from the area of the golf course. Dr. Spratt was not aware of any other streams leading into Montlake. In addition to looking at the contour maps, Dr. Spratt also walked around Montlake "one full time and other bits and pieces, various areas."

Dr. Spratt testified:

The studies that I have done in other wetlands and ponds included the use of a radioactive label herbicide, to look at the presence of microorganisms that are capable of totally breaking the herbicides down, like carbon dioxide in the water, sulphur, salt water, whatever compounds are present, and removing that chemical from the system.

And so this is - - in the area of our litigation, that is an ideal situation, and so I'm interested in that, so I would like to try and clean up the problems. And so I have this system in the lab set up where we collect samples, bring them into the lab and we completely, within our licensure, using radioactive compounds, using chambers.

I have a picture of a chamber, and it's in those (indicating). We transfer the soil, a small portion of soil and make a soil/saltwater mixture and that goes into the chamber which then is trapped for carbon dioxide, and we add

-6-

radioactive compound.

We can trap the carbon dioxide in a syringe, remove the solution and periodically make up a time source. We see the increase in the radioactive control coming off. And so I set up one of these experiments starting on May 16th, approximately May 16th. Collected samples from two of the ponds on the golf course, one on the 18th fairway and one on the 3rd fairway.

I got three samples from the east pond at various places. Run a uniform sample, collected water samples from the bluff and then also collected samples from the edge of Montlake. Montlake is a little more difficult to sample because there's not much - - you can't get to it very easily. I did not have a boat. However, I did find three uniform samples, one in the lake.

When asked about his findings, Dr. Spratt testified:

The date [sic] that we count from the little device I showed you, the chambers, we calculate the rate, the accumulation of carbon, 14CO2 [sic], over time. It shows the end rate for the three - - the two ponds on the golf course. They're very similar to the rate for Montlake. And then there's a killer control here, too, but there has to be live bacteria. The killer control doesn't do anything.

To summarize this data and calculate maximum rate, this graph shows the maximum mineralization rate of my target herbicide. And the point here to note is that these three bars - - the one on this side, the right side, is the 18th fairway pond, the middle is the 3rd fairway pond, and Montlake is on the far left - - these three rates are not significantly different, so they essentially are the same. And the killer control is down here.

The only thing that was different on this graph is the killer control; it was the only thing different from any of those two ponds. So this suggests that those three ponds have the same record of prior exposure to the chemical range structure similar to the target herbicide that I used.

Dr. Spratt also was provided with records of the chemicals that the golf course has used for approximately two and a half years. He testified:

Of the chemicals that were added - - or reported in those records, I saw a variety of fertilizers, at least one herbicide, at least two insecticides or compound that had insecticide in it, and then one specific fungicide. I went

through all of those two and a half years and made an accounting of the date they were applied and approximately doses that were used.… Well, the herbicide referred to on the - - and I believe this particular herbicide is noted as pre[-]emergent, so they were used, for the most part, either in the early spring or the - - there was one case of late - - two cases of late-fall application.… The insecticides were added basically when insects might be active, starting in April and running up right through the summer. June, July, August, and September are the last application of all of these. There was one, a different insecticide that was added in October on one occasion.… The fungicide also ran basically that same time line, starting in late April and through - - there was an application in December of last year, so that's varying.… [T]he insecticides appear to be [applied to the golf course] once a month, maybe once every three weeks. The fungicide was, on occasion, once every week; usually once every two weeks.

* * *

Now the chemicals that I presented earlier that lists the summary of the chemicals that were added, the insecticide and the fungicide, I found data on those two chemicals. And, particularly, since they're being applied during the warmer months of the year, they can interfere with the mating of fish, mating of insects, and other aquatic organisms.

And I looked up those and, indeed, they are organic synesthetic compound. This is a - - Talstar is the trade name. It's bifenthrin, an insecticide. Now, this compound, if you will look at the material safety data sheet, it is hazardous to fish and aquatic organisms. And, basically, the rules of use say it should not - - organic give [sic] any water course in any way. So again, there are range structures here that have to be followed in order for this compound to be harmless.… The other one is the fungicide Daconil, chlosothalomil; it's a fungicide. Again, it has a range structure here. In this case, it's generally very harsh in that regard because the cholerine is added to the range. But that is another compound that was used during the active growing season. And it also has material safety issues, hazardous to fish and aquatic organisms.

Dr. Spratt testified that:

eventually some of that herbicide would make its way down into the Montlake, the lowest point of the drainage. There are a variety of factors that have to

occur. The time between the application and the rainfall, sometimes that can affect transfer. It could be accelerated if it were applied and a heavy rain came more or less immediately.

Also some of those, I believe on the 3rd hole, was actually closer to Montlake, and so what's applied there at the shorter resonance time on the golf course, you have the conditions to wash it off in the stream.

When questioned, Dr. Spratt admitted that he had seen ducks and a turtle at the golf course ponds. Dr. Spratt also agreed that fungicide is used on golf courses to control fungus on the greens and that the greens encompass probably less than one percent of the total square footage of the entire golf course. Dr. Spratt was unsure of the distance between the closest green and Montlake but estimated that it might be 200 meters.

When asked, Dr. Spratt admitted that he was aware that the golf course would use water from Montlake during the dry season and further agreed that the dry ground "will absorb a good bit of [the water], and a lot of it will evaporate away." Dr. Spratt further admitted that a heavy rain also would drain residue from the herbicides into Montlake. He testified that there appear to be several residential properties that also drain into Montlake, and that any household fertilizers, herbicides, and insecticides used there also could drain into Montlake. Dr. Spratt testified that there is a drainage ditch that runs from the top of the plateau across the golf course and down into Montlake and that this drainage is, at maximum, 50 meters from the golf greens. When asked if there was the potential for residue running off of the golf course and into the lake from rainwater whether the lake was being pumped or not, Dr. Spratt stated "[t]hat's the chance. It's a possibility."

Rick Gehrke also testified as an exert for Plaintiff. Mr. Gehrke has a Master's Degree in environmental science with concentrations in management and law. When asked what type of investigation and analysis he did on the property at Montlake, Mr. Gehrke stated: "The first thing I did was do some research on the property, looking at area maps, looking at the rudders that's left by the lake. I did some research into golf course operations and chemical use, and spoke also with the state regulatory agencies about permitting requirements." Mr. Gehrke also went to Montlake and spent time:

looking for the layout of the land, looking for creek conveyance, which when water leaves, it's just an acidic source that you can see where there are channels that water runs in. I'm looking at the arrangement of the pumping station. Looking at the vegetation, slopes, stability of the rocks around Mr. Pollard's lake.

When asked for his analysis regarding pumping water from Montlake into the ponds on the golf course which then would drain back into Montlake, Mr. Gehrke testified:

> I see two main issues there. One of them has to do with the pumping of the water itself, because a natural lake is structured, obviously, to rising and falling water levels. But when you take more water out of it than is naturally draining or evaporating, especially even times when the water is low, it's going to impact the water quality by concentrating on the bottom, impacting stream banks, because if you drop the water level faster than the plants can respond, they're going to die. If you stabilize [sic] the banks you're introducing erosion, which is going to further exacerbate clarity problems with the water, things like that. Also, from my research into golf course operations, there are a lot of chemicals that are typically used on a golf course, and any flood coming off of a golf course is going to be carrying some of those with them.

Mr. Gehrke testified that water gets into Montlake "[t]hrough rainfall and through the conveyance that we were talking about. There is a little stream that runs out at the golf course and goes over a cliff on one side of the lake."

When asked about how chemicals would affect plant and animal life in the lake, Mr. Gehrke stated:

> There is a group of chemicals that get used when you're trying to maintain basically a system that wouldn't naturally occur, had to be sustained, and those are fertilizers and generally nitrogen, phosphorus, potassium are the main ones. You've also got fungicides and insecticides, and herbicides to control the plants, only the plants that you want on there. These are things that you don't want on the golf course but you do want them in the lake if you want to have a natural lake, so they're designed to kill something in one place, and then goes to where it's not, then they're going to have an impact that you don't want in a natural system…. Well, if you have an herbicide that's meant to get rid of what we call a weed on a golf course, that might be a plant that is wanted on the banks of the lake. So you've got a double whammy on this life-form, where they might be getting exposed to a chemical that they can't handle or that they can't adapt having their root system stressed by the drop in water level.

Mr. Gehrke admitted that he did not do any water testing at Montlake. He further admitted that rain runoff from the golf course would add chemicals to the lake.

Bill McGriff, the utility commissioner for the Utility District, testified at trial. Mr. McGriff has been the utility commissioner since 1999. Montlake was the sole source of water for the Utility District through the early 1980s. In the early 1980s, the Utility District made arrangements to get water from the Soddy-Daisy Falling Water Utility District due to concerns about the amount of water available in Montlake. The Utility District has not pumped water from Montlake in years, but maintained the Easement to be used in case it was needed. The Utility District did not dismantle any of its equipment at Montlake, but did recently sell a tank. The Utility District has never taken any action while Mr. McGriff has been on the commission to abandon the Easement.

Mr. McGriff testified that the Utility District was contacted by the golf course owner, Mr. Luken, and that it commenced negotiations with Mr. Luken for transfer of the easement in 2003 or 2004. The Utility District traded Mr. Luken the lot with the metal building and the easements and water rights to Montlake in exchange for a parcel of property adjacent to an existing stand-pipe tank and $50,000.

Carlin Carpenter, one of the original commissioners for the Utility District, testified that he held this position when the Easement was recorded in 1970. When asked, Mr. Carpenter testified that the Utility District never considered abandoning the Easement. When asked how many gallons of water were pumped from Montlake on a daily basis during the peak usage when Montlake was used by the Utility District, Mr. Carpenter stated: "The maximum population was probably 400 to 450 customers, and the average usage was 2,000 to 2,500 gallons a minute. I don't know the exact figures." Mr. Carpenter agreed that it probably was over a hundred thousand gallons a day pumped from Montlake. Mr. Carpenter testified that the Utility District pumped the lake in the early 1980s, and the water level fell below the intakes, which required the Utility District to have water hauled in by tanker. This led to the Utility District making arrangements to get water from the Soddy-Daisy Falling Water Utility District.

David Campbell, Jr., the superintendent of Montlake Golf Course, testified that the pumps were put into Montlake six months to a year before trial. The pumps were encased, and were installed by a contractor and put in with new electrical work done by an electrician. Mr. Campbell testified that the pumps were designed for underwater pumping. Mr. Campbell tested the pumps one time for 14 hours continually. He estimated that the pumps combined can pump 100 gallons a minute.

When asked, Mr. Campbell testified that the golf course consists of 150 acres that are cleared, and that the greens comprise only about two of those acres. Mr. Campbell stated: "The pond, the animal life is great. We have fish and everything you can think of in there. The plant[-]life is fine. Never had any problem with it. Just keep it mowed." He

testified that the golf course ponds have turtles and fish.

Mr. Campbell testified that the golf course uses its sprinkler system approximately three times a week at certain times of the year. Based upon his experience operating the golf course for the past two years, Mr. Campbell estimated that they would be most likely to need to pump from Montlake in July and August for "15 to 20 days out of those two months."

Kim White, the president of Stone Fort, Inc., testified. Stone Fort, Inc. owns Montlake Golf Course. Stone Fort, Inc. was known formerly as Montlake, Inc. Ms. White testified that Mr. Luken purchased the golf course in the late 1990s. Ms. White was shown a photograph of Montlake that showed some brown area around the lake. When asked if that was from back water, she stated: "I don't know, but I do know residents that have lived there a long time that told me the reason that some of [the] vegetation was dead was that the water level got so high the past couple of years, that it rotted the trees that were in the lake."

Billy Joe Russell has owned property in the Montlake Properties Subdivision since approximately 1981. He testified that he is a member of the Property Owners Association. Mr. Russell agreed that the Property Owners Association supports the golf course's plan to pump water from Montlake because the golf course is an important part of the community. Mr. Russell testified that he has not seen any problems with plant-life, wildlife, or fish around the golf course ponds. When asked if he had seen any dramatic change in the appearance of Montlake, Mr. Russell testified:

Well, the only thing I can tell you is when [Mr. Pollard] rents those houses and there's quite a few people up there, I've been up there before and there would [be] 20 or 30 people down there around, swimming and doing whatever, you know, and leaving garbage laying around, it's develops from that. And some of the nastiness, you might say, just comes off of that, you know. That's all I can say about that part of it.

You know, I haven't seen the lake deteriorate none besides when the water got high in the wintertime; we had a lot of damage to it and some of the trees did get killed from the water getting so high. And then it went back down and your vegetation starts to grow again.

Mr. Russell testified that he observed Montlake in the early 1980s when the Utility District was pumping and the water level fell below the pumps. He testified:

Well, what it did was it got down below the pumps, about like where it was

starting to suck air is what happened to it. They brought line in there, and they still had 40 or 60 foot of water, but the pumps wouldn't reach any further. So that's when they begin [sic] to haul it in to get the water over the pumps.

Charles Hunt, testified that he was the president of the Property Owners Association for three years. Mr. Hunt testified that when the issue of water rights arose:

We were for it unanimously. We were for it because of the position of the golf course in reference to the property of the people who owned houses on the golf course. And it was imperative that the golf course do good for the property owner, you know, that the property would still remain at a high value.

Mr. Hunt has not observed any change in the quality of the water in the golf course ponds, nor has he seen any change in the plant or animal life around those ponds. Mr. Hunt testified that he has observed the condition of the houses that Mr. Pollard rents after tenants leave and stated that he had observed "[b]eer cans and beer bottles in the lake."

After trial, the Trial Court entered its order on July 8, 2008 finding and holding, *inter alia*, "[t]hat Luken Properties, LLC, has an easement right to withdraw water from Montlake," that the Easement had not been abandoned, that the Easement had not terminated, and that Plaintiff had not proven nuisance. The Trial Court entered an order on November 12, 2008 amending its July 8, 2008 order to state that defendant's counterclaim was dismissed for lack of proof and that the July 8, 2008 order as amended constituted a final order as to all issues. Plaintiff appeals to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises four issues on appeal: 1) whether the Trial Court erred in finding that the Easement had not been abandoned; 2) whether the Trial Court erred in finding that the Easement had not terminated; 3) whether the Trial Court erred in not finding that trespassers entering Plaintiff's property over the Easement constituted a nuisance; and, 4) whether recycling of water from the lake to the golf course and then back to the lake constitutes nuisance.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

-13-

We first note what Plaintiff's lawsuit is not about. Plaintiff's lawsuit was not about the continuing operation of the golf course. As stated in Plaintiff's brief, Plaintiff "sought a declaration that an easement claimed by the [defendants] was null and of no effect or in the alternative an Order preventing [defendants] from using it." Our resolution of the issues raised by Plaintiff in this appeal is predicated upon the relief Plaintiff sought in the complaint.

We first consider whether the Trial Court erred in finding that the Easement had not been abandoned. Tennessee law provides "[t]he party asserting abandonment of an easement must prove it by clear, unequivocal evidence." *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998)[2]. *Accord, e.g., Miller v. Street*, 663 S.W.2d 797, 798 (Tenn. Ct. App. 1983); *Cottrell v. Daniel*, 205 S.W.2d 973, 976 (Tenn. Ct. App. 1947). Thus, the proper standard in an abandonment of an easement case is clear and unequivocal. Clear and convincing evidence and clear and unequivocal evidence are one and the same. *See Gambill v. Hogan*, 207 S.W.2d 356, 360-61 (Tenn. Ct. App. 1947) (equating "clear and convincing evidence" to "clear and unequivocal evidence" and "clear, cogent and convincing evidence").

Tennessee law is well settled regarding abandonment of an easement. An easement may be abandoned, but the party attempting to prove abandonment must show both "an intention to abandon the easement [and] also external acts carrying that intention into effect." *Hall*, 984 S.W.2d at 620. *Accord, e.g., Phy v. Hatfield*, 126 S.W. 105, 105 (Tenn. 1909); *Boyd v. Hunt*, 52 S.W. 131, 131 (Tenn. 1899); *Cottrell*, 205 S.W.2d at 975; *Smelcer v. Rippetoe*, 147 S.W.2d 109, 113-14 (Tenn. Ct. App. 1940). Mere nonuse of the easement "is not sufficient, by itself, to prove abandonment. Nonuse must be coupled with proof that the easement holder or holders intended to abandon the easement." *Hall*, 984 S.W.2d at 620-21. *Accord, e.g., Boyd*, 52 S.W. at 131; *Edminston Corp. v. Carpenter*, 540 S.W.2d 260, 262 (Tenn. Ct. App. 1976); *Cottrell*, 205 S.W.2d at 975; *Smelcer*, 147 S.W.2d at 113-14.

The required external acts necessary to prove abandonment may be "either a single act or a series of acts." *Hall*, 984 S.W.2d at 621. Courts may consider several factors in making a determination of whether an easement has been abandoned including:

(1) statements by the easement holder acknowledging the easement's existence and disavowing its use, (2) the easement holder's failure to maintain the

---

[2]On remand, new issues arose and were subsequently appealed. *See Hall v. Pippin*, No. M2001-00387-COA-OT-CV, 2001 Tenn. App. LEXIS 124 (Tenn. Ct. App. Feb. 28, 2001); *Hall v. Pippin*, No. M2000-001151-COA-R3-CV, 2002 Tenn. App. LEXIS 824 (Tenn. Ct. App. Nov. 26, 2002), *modified by*, No. M2000-01151-COA-R3-CV, 2003 Tenn. App. LEXIS 113 (Tenn. Ct. App. Feb. 11, 2003). The issues involved in the subsequent appellate history have no bearing on the holding we rely upon in this Opinion.

easement in a condition permitting it to be used for access, (3) the easement holder's acquiescence in the acts of others that reduce the utility of the easement, (4) the easement holder's placement of a permanent obstruction across the easement, or (5) the easement holder's development of alternative access in lieu of the easement.

*Id*.

The Trial Court found and held that the Easement had not been abandoned. The evidence in the record on appeal shows that the Utility District never did anything to disavow the Easement. Rather, the testimony shows that even after it began to obtain water from another source, the Utility District continued to view the Easement as a viable option and a back-up plan. Both Mr. McGriff and Mr. Carpenter testified that the Utility District never considered abandoning the Easement. In fact, the Utility District clearly evidenced the continued existence of the Easement as a valid easement when it sold the easement rights to Luken Properties. Furthermore, although Plaintiff argues that the Utility District did not maintain the Easement in a condition to allow for access, the evidence in the record on appeal shows that the Utility District never dismantled or removed its equipment, never took steps or allowed anyone else to take steps to block access to the Easement, and did not place or allow placement of a permanent obstruction in the Easement. The fact that the Utility District had not used the Easement for some years was insufficient, by itself, to prove that the Utility District had abandoned the Easement.

The Trial Court found that Plaintiff had failed to prove by clear and unequivocal evidence that the Easement had been abandoned. The evidence does not preponderate against the Trial Court's findings with regard to this issue.

We next consider whether the Trial Court erred in finding that the Easement had not terminated. Plaintiff argues that the Easement was granted only "for so long as water shall be present in said lake," and because the water in Montlake fell below the intake pumps in the 1980s, the Easement terminated at that time. (emphasis deleted). Plaintiff is mistaken.

The language granting the Easement is not ambiguous on this issue. Under the clear language of the Easement, the relevant factual question on this issue is whether water was present in the lake. The evidence in the record on appeal shows that although the water level fell below the intake valves, water still was present in Montlake at that time. Mr. Russell, who has lived in the area since the early 1980s, testified that at that time Montlake "still had 40 or 60 foot of water…." Thus, water was present in the lake and the Easement did not terminate. The evidence does not preponderate against the Trial Court's findings and conclusion that the Easement had not terminated.

Next we consider whether the Trial Court erred in not finding a nuisance. With regard to this issue, the Trial Court specifically found:

> Mr. Pollard says he is afraid of people using the platform to access the lake. If they are electrocuted or become ill due to harm from the chemicals, Mr. Pollard fears a lawsuit. The photos show that efforts have been taken to secure the platform, Trial Exhibits 54 and 56, and to warn trespassers. Trial Exhibits 44, 44A and 15. As we unfortunately learned recently from Six Flags, not even fences and warning signs keep all persons from danger. In the Verified Complaint, Plaintiffs alleged that trespassers would jump into the lake from the cliffs about the lake. Luken does not control the cliffs.

> Mr. Pollard's testimony about the lake and environs was contradicted by neighbors who live there all the time. Mr. Pollard primarily resides in Florida. Mr. Pollard's credibility was adversely affected by the ads for his "vacation home." Trial Exhibit 46, dated July 25, 2007, was the advertisement used before Mr. Pollard learned of Luken's proposed use of water from the lake. Trial Exhibit 59, Mr. Pollard's internet ad of May 27, 2008, is the same advertisement. These advertisements carry a different message than Mr. Pollard's testimony[] at trial.

In *Wells v. Tennessee Bd. of Regents*, our Supreme Court observed:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell- Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

-16-

We give great deference to the Trial Court's credibility determinations. The evidence does not preponderate against the Trial Court's findings with regard to the issue of nuisance, and we affirm the Trial Court on that issue.

Finally, we consider whether recycling of water from the lake to the golf course and then back to the lake constitutes nuisance. With regard to this issue, the Trial Court specifically found:

Plaintiffs employed Henry G. Spratt, Jr., Ph.D., to do some testing and to testify about possible adverse effects of chemicals being absorbed in the water. Dr. Spratt is a professor of biological and environmental sciences at UTC. His CV was introduced as Trial Exhibit 1. Copies of the chemicals used, and their times of usage, at the golf course were introduced as Trial Exhibit 4.

Dr. [Spratt] introduced three graphs, Trial Exhibits 7, 8 and 9. On two of the graphs, 7 and 9, the third fairway of Montlake Golf Course has higher rates of simazine mineralization than the lake. The third fairway is closest to adjoining owners and the creek that flows into the lake.

Dr. [Spratt] testified that rain could also be a source of water that flows into the lake. There are adjoining neighbors who may also use fertilizers and herbicides on their land. Those persons, through watering their yards and/or rain, could also add to the chemical input into the lake.

The court did not credit Dr. [Spratt] with noting anything close to a clear and present danger. There was nothing definite that the court could use to conclude that the pumping of water from the lake to the retention pond near the third fairway and its return to the lake would be, as opposed to theoretically could be, so dangerous so as to prohibit Luken's proposed removal of water from the lake.

Richard Gehrke, who has a M.A. in Environmental Science, also testified about the adverse effect of chemicals. He had not conducted any water tests. He could not quantify how much worse the lake would be as a result of the chemicals used on the golf course. He spoke on a theoretical basis.

Mr. Campbell, an employee at the Montlake Golf Course, said he had seen very little runoff from the course's ponds to the creek. The use of

chemicals at the course did not affect the fish in the pond or other wildlife at the golf course. He talked about the new pumps having been installed by contractors. A new electrical panel with appropriate grounding was installed. The new pumps worked well during the testing period.

Again, we defer to the Trial Court's credibility determinations. The evidence does not preponderate against the Trial Court's findings relative to this issue, and we find no reversible error by the Trial Court as to this issue.

As the evidence does not preponderate against the Trial Court's findings and we find no error of law, we affirm the Trial Court's November 12, 2008 order.

## Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Corporacion Euanitos, S.A., and its surety.

_____
D. MICHAEL SWINEY, JUDGE
